1
2
3
4
5
6
7
8
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
9
AT TACOMA

10

SANDRA WHITE,                                    CASE NO.     C06-5333FDB-KLS

11
                              Plaintiff,         REPORT AND
12          v.                                   RECOMMENDATION

13   JO ANNE B. BARNHART, Commissioner of        Noted for January 5, 2007
     Social Security,
14
                              Defendant.
15

16

17

18          Plaintiff, Sandra White, has brought this matter for judicial review of the denial of her application for

19   disability insurance benefits.  This matter has been referred to the undersigned Magistrate Judge pursuant to

20   28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR 4(a)(4) and as authorized by Mathews,

21   Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After reviewing the parties' briefs and the remaining

22   record, the undersigned submits the following Report and Recommendation for the Honorable Franklin D.

23   Burgess' review.

24                              FACTUAL AND PROCEDURAL HISTORY

25          Plaintiff currently is fifty-five  years old.[1] Tr. 53.  She has two years of college education and past

26   work experience as an accounts payable clerk. Tr. 97, 102, 126, 626.

27   _____

28          [1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access
     to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

On September 21, 2001, plaintiff filed an application for disability insurance benefits, alleging disability as of September 5, 2001, due to the following illnesses and conditions:  fibromyalgia, foggy thinking, intestinal infections, a growth hormone deficiency, the Epstein-Barr virus, a chronic fatigue immune dysfunction syndrome, migraines, vomiting, seasonal affective disorder, environmental allergies and chemical sensitivities, irritable bowel syndrome, osteoporosis, depression, and anemia. Tr. 53, 82-84, 96. Her application was denied initially and on reconsideration. Tr. 53-55, 61.

A hearing was held before an administrative law judge ("ALJ") on March 26, 2003, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 31-52.  On April 9, 2003, the ALJ issued a decision, determining plaintiff to be capable of returning to her past relevant work as an accounts payable invoice clerk and therefore not disabled. Tr. 15-30.  On April 28, 2003, plaintiff's request for review was denied by the Appeals Council. Tr. 5, 619.  She appealed to this Court, where the parties stipulated to remand the matter for further administrative proceedings. Tr. 619, 634-37.

On remand, a second hearing was held before a different ALJ on March 7, 2006, at which plaintiff, represented by counsel, again appeared and testified, as did two medical experts and a vocational expert. Tr. 958-996.  On April 10, 2006, the ALJ issued a decision, also determining plaintiff to be not disabled, finding specifically in relevant part:

    (1)    at step one of the disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity at any time relevant to the ALJ's decision;

    (2)    at step two, plaintiff had a "severe" combination of impairments consisting of fibromyalgia, osteoporosis, mild degenerative disc disease of the lumbar spine, migraine headaches, anemia, chronic bronchitis, gastroesophageal reflux disease, a sleep disorder, a depressive disorder, and a somatoform disorder;

    (3)    at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; and

    (4)    at step four, plaintiff had the residual functional capacity to perform essentially sedentary work, with other non-exertional limitations, which did not preclude her from performing her past relevant work as an accounts payable clerk.

Tr. 621-26.  It does not appear from the record that the Appeals Council assumed jurisdiction of the case. 20 C.F.R. § 404.984.  The ALJ's decision therefore became the Commissioner's final decision after sixty days. Id.

---

[2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

On June 14, 2006,[3] plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1).  Specifically, plaintiff argues that decision should be reversed and remanded for an award of benefits or, in the alternative, for further administrative proceedings, for the following reasons:

(a)     the ALJ erred in evaluating the medical evidence in the record;

(b)     the ALJ erred in assessing plaintiff's residual functional capacity;

(c)     the ALJ erred in assessing plaintiff's credibility;

(d)     the ALJ erred in evaluating the lay witness evidence in the record;

(e)     the ALJ erred in finding plaintiff capable of returning to her past relevant work; and

(f)     in light of the vocational expert's testimony, plaintiff should be found disabled at step five of the disability evaluation process.

The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set forth below, recommends that while the ALJ's decision should be reversed, this matter should be remanded to the Commissioner for further administrative proceedings.  Although plaintiff requests oral argument in this matter, the undersigned finds such argument to be unnecessary here.

<u>DISCUSSION</u>

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision.  <u>Hoffman v. Heckler</u>, 785 F.2d 1423, 1425 (9th Cir. 1986).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Fife v. Heckler</u>, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than a scintilla but less than a preponderance.  <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); <u>Carr v. Sullivan</u>, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision.  <u>Allen v. Heckler</u>, 749 F.2d

---

[3]As indicated, plaintiff's complaint was filed more than sixty days after the Commissioner issued her final decision.  A party may obtain judicial review of the Commissioner's final decision by commencing a civil action in federal court "within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow." 42 U.S.C. § 405(g); 20 C.F.R. §§ 404.981, 404.982, 416.1481, 416.1482.  This "sixty-day time limit is not jurisdictional, but is instead a statute of limitation which the Secretary may waive." <u>Banta v. Sullivan</u>, 925 F.2d 343, 345 (9th Cir. 1991).  As such, failure to file within the sixty-day time limit is an affirmative defense, which "is properly raised in a responsive pleading." <u>Vernon v. Heckler</u>, 811 F.2d 1274, 1278 (9th Cir. 1987) (citing Federal Rule of Civil Procedure 8(c)).  Because the Commissioner failed to raise the statute of limitations as an affirmative defense in her responsive pleading, the issue is waived, and the undersigned will deal with this matter on its merits.

1   577, 579 (9th Cir. 1984).

2   I.      The ALJ's Evaluation of the Medical Evidence in the Record

3           The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

4   medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in the

5   record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the

6   ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion must

7   be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir.

8   1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact

9   inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts

10  "falls within this responsibility." Id. at 603.

11          In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be

12  supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a

13  detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

14  thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the evidence."

15  Sample, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences from the

16  ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

17          The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

18  either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

19  treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and

20  legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However, the

21  ALJ "need not discuss all evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739

22  F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only explain

23  why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07

24  (3d Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

25          In general, more weight is given to a treating physician's opinion than to the opinions of those who

26  do not treat the claimant. Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of

27  a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or

28  "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190,

1195 (9th Cir.,2004); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Tonapetyan v. Halter</u>, 242

F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the

opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830-31.  A non-examining physician's opinion may

constitute substantial evidence if "it is consistent with other independent evidence in the record." <u>Id.</u> at 830-

31; <u>Tonapetyan</u>, 242 F.3d at 1149.

      A.   <u>Dr. Meharg</u>

      Plaintiff was evaluated by Stephen S. Meharg, Ph.D., in late September 2005.  Dr. Meharg noted

that while plaintiff's medical history indicated she had been diagnosed formally with a sleep disorder, she

was "noncompliant with her prescribed" treatment therefor, a CPAP machine. Tr. 743.  He further noted

that her psychiatric treatment had been "relatively limited," although she related that Prozac, which she had

taken "for years," had been helpful. <u>Id.</u>  During the evaluation itself, while plaintiff exhibited "some

occasional shifting in her chair due to discomfort, no significant pain behaviors were observed." <u>Id.</u>  Her

pace and persistence also were average and slightly above average respectively, though she did show "some

tendency to have difficulty adjusting from one task to another." <u>Id.</u>

      Plaintiff showed "excellent" attention and concentration, and described her recent mood as "kind of

down." <u>Id.</u>  Dr. Meharg noted she "tended to focus more on somatic symptoms of fatigue [rather] than any

clear descriptions of dysphoria or anxiety." <u>Id.</u>  Although plaintiff reported that the quality of her sleep

varied from night to night, she also stated that it was "generally adequate with her current medication

regimen." <u>Id.</u>  Further, plaintiff denied having any psychotic symptoms or "clinically significant anxiety

symptoms apart from situational tension." Tr. 743-44.  Her vocabulary, reasoning and general fund of

knowledge "were all within normal limits" as well. Tr. 744.

      Psychological testing conducted by Dr. Meharg showed plaintiff to be "in the average range of

overall intellectual functioning," which he felt did not appear to suggest "any form of acquired cognitive

dysfunction." Tr. 745-46.  Such testing also indicated that plaintiff was not attempting to magnify her

psychiatric symptoms, though it did reveal "extreme elevations on measures of somatic preoccupation,

depression, and tendency to develop psychosomatic symptoms under stress." Tr. 747.  Dr. Meharg further

commented on this aspect of the testing results as follows:

> This profile tends to represent a classic somatization syndrome, with primary symptoms
> often involving pain, weakness, and profound fatigue.  Although many of Ms. White's

somatic symptoms represent emotional experiences expressed through physical means, it is almost impossible to differentiate what symptoms are psychological and which have the basis in genuine organic dysfunction.

Id.

Dr. Meharg diagnosed plaintiff with a "[p]ain disorder associated with psychological factors and a general medical condition" and a major depressive disorder. Tr. 748.  He also assessed her with a current global assessment of functioning ("GAF") score of 45, and noted that diagnostically, her psychological profile, as revealed through testing, suggested "some form of somatization disorder overlaid on" her major depression.  Id.  He considered "the long-term prognosis" for individuals such as her to be poor, as their "behavior traits tend to be relatively constant and unchanging, despite what might appear to be short-lived symptomatic relief in response to various medical and/or psychological interventions." Tr. 747.

Dr. Meharg opined that plaintiff herself likely was "quite unaware of the underlying psychological processes contributing to her somatic situation," and that she likely would not "accept any notion that her physical symptoms have a psychological base." Id.  He further felt that her symptoms were less likely to be supported by objective physical findings, with respect to which "traditional medicine interventions" also were less likely to show relief, and that the ways in which her symptoms were presented and maintained were "more influenced by emotional and social motivations (sometimes termed 'secondary gain')." Id.  At the same time, Dr. Meharg also completed a medical source statement of ability to do mental work-related activities, in which he found that while plaintiff's cognitive capacity to understand, remember and carry out instructions remained intact, she was moderately impaired in her ability to interact appropriately with supervisors, co-workers and the public, and markedly impaired in her ability to respond appropriately to work pressures and changes in a work setting. Tr. 751-52.  He felt her physical functioning, furthermore, would "deteriorate quickly under stress."
 Tr. 752.

Plaintiff argues that while the ALJ briefly summarized portions of Dr. Meharg's report, nowhere did the ALJ provide any reasons for *sub silentio* rejecting his opined limitations.  This, however, is not what the ALJ actually did.  While the ALJ did not expressly state in so many words that he was rejecting those limitations, he did find as follows:

> Stephen Meharg, Ph.D., an evaluating psychologist, opines claimant has no limitations in her ability to understand, remember and carry out instructions.  She is moderately

limited in the ability to interact with the public, coworkers and supervisors.  She is markedly limited in the ability to respond appropriately to work pressures in a usual work setting and in the ability to respond appropriately to changes in a routine work setting (Exhibit 30F).  While the claimant's somatic focus may result in some limitations in her ability to interact with others and respond appropriately to changes and stress in a work setting, the undersigned finds that in a routine type of work setting with occasional public contact, she would be capable of interacting appropriately with others.  She would be capable of responding to work pressures and changes in a routine work setting.  Dr. [Lisa M.] Cosgrove found no impairment in her ability to maintain regular attendance, work on a consistent basis, accept instructions from supervisors, or interact with coworkers and the public, but noted that [the] claimant might prefer a desk job in an independent setting (Exhibit 11F).  Dr. Cosgrove's assessment is more consistent with the claimant's daily functioning.  She functions independently, manages finances, is active in church activities and has required no mental health treatment.

Charles Belleville, M.D., an evaluating psychiatrist, opined the available records did not support that any of her medical or psychiatric conditions were preventing her from working (Exhibit 35F).  The opinion of Dr. Bellville is given significant weight.

Tr. 626.  Clearly, the ALJ rejected the limitations found by Dr. Meharg based in part on the findings and opinions of these two other examining medical sources, which is a valid reason for doing so.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996) (where opinion of examining physician is based on independent clinical findings, it is within ALJ's discretion to disregard conflicting opinion in another examining physician's diagnosis).

In her reply brief, plaintiff attempts to discredit the opinions of Dr. Cosgrove and Dr. Bellville.  The undersigned finds plaintiff's arguments in this regard to be without merit.  In late February 2002, plaintiff was referred to Dr. Cosgrove, a doctor of osteopathy, for a psychiatric evaluation by the Social Security Administration.  Tr. 406.  Plaintiff appeared to be "in no acute distress," her eye contact was appropriate, and her attitude was "pleasant and cooperative."  Tr. 408.  Her mood was euthymic and her affect broad.  Id.  Dr. Cosgrove found no evidence of paranoia, delusions, hallucinations, or other issues regarding thought content.  Id.  Plaintiff denied being a danger to herself or others, she was alert and oriented, and her speech, stream of mental activity and concentration were all intact, as largely was her memory.  Tr. 408-09.  Insight was deemed to be "nil," but social functioning was thought to be "adequate."  Tr. 409.

Dr. Cosgrove found that based on the mental status examination and plaintiff's "continual wanting to focus on her somatic problems," the evidence was "suggestive of someone who has sublimated her psychiatric conflicts into physical complaints."  Tr. 410.  Thus, she diagnosed plaintiff with a somatoform disorder, as well as dependent personality traits.  Tr. 409-10.  However, Dr. Cosgrove also assessed her with a "present" GAF score of 70.  Tr. 410.  In terms of plaintiff's prognosis, she opined:

> Regarding the ability of the claimant's illness to be treated, it certainly can be; however, the claimant is somewhat defended against seeing a psychiatrist, although she has in the past seen a counselor for a brief period of time. Therefore, likelihood of receovery would be considered guarded.

Tr. 410. With respect to plaintiff's functional capabilities, on the other hand, Dr. Cosgrove concluded in relevant part as follows:

> It is important to note that the claimant worked for many years with these complaints, including working and wearing the environmental mask for almost 10 years. Therefore I see no impairment in her ability to maintain regular attendance, work on a consistent basis, accept instructions from supervisors, or interact with coworkers and the public.
>
> It [sic] realistic, however to think that she would likely *prefer* to be at a desk job in a more independent setting. I would recommend that she be referred to the Department of Vocational Rehabilitation for job skills retraining.

Id. (emphasis in original).

Clearly, Dr. Cosgrove's conclusions regarding plaintiff's work-related functional capacities are at direct odds with those opined by Dr. Meharg. Plaintiff asserts, however, that the Court must appreciate the time differences in the evaluations performed by these two examining medical sources. While it is true that there is a significant time difference between the time Dr. Cosgrove issued her report and when Dr. Meharg performed his evaluation, plaintiff fails to explain why a mere difference in time alone is cause for discrediting Dr. Cosgrove's findings. Although certainly where the evidence in the record as a whole indicates there has been a change in the claimant's profile, so that the later issued medical source opinion is shown to more accurately reflect the true nature and effects of the alleged impairment, that later opinion should be given greater weight. Here, however, plaintiff has made no such showing, nor does the record indicate that this is necessarily the case.

For example, Dr. Bellville, the other examining medical source opinion upon which the ALJ relied, performed a psychiatric evaluation of plaintiff in mid-February 2005, less than eight months prior to the psychological evaluation conducted by Dr. Meharg. Tr. 771. Dr. Bellville's findings and opinion largely comport with those of Dr. Cosgrove. Dr. Belleville observed that plaintiff "sat throughout the interview without any significant emotional or physical distress." Tr. 783. Her eye contact was "fairly good," and while her speech showed "a mild increase in latency" and was "slow and a little monotone," it was "goal-directed and showed no signs of loose associations." Tr. 784. Plaintiff's use of vocabulary also was good, and her ability to carry on a conversation and to remember dates was intact. Id.

Plaintiff denied, and she did not demonstrate, any psychotic symptoms, and her mood was "neutral to mildly depressed," while her affect was "mildly blunted." Id.  She was "fully oriented," and her intellect, fund of knowledge and "other executive functions" were generally intact. Id.  Plaintiff was able to think logically and abstract appropriately, and she showed "reasonably good" judgment. Tr. 784-85.  Although her insight was limited, she had no suicidal or homicidal ideations. Tr. 785.

Dr. Bellville noted that while plaintiff "may have had major depression at times in her life," that appeared "currently to be in partial to full remission." Tr. 787.  Thus, he diagnosed her with dysthymia, or chronic low-grade depression. Id.  In addition, Dr. Belleville noted that there seemed to be "a question as to somatoform disorder," and thus that she tended "to over-focus on somatic complaints" and had " a lot of complaints of pain with unclear objective documentation." Id.  He also noted that there might be "a history of generalized anxiety disorder as well as possible agoraphobia or social phobia." Id.

Dr. Bellville further opined, as had Dr. Cosgrove three years earlier, that her GAF score had been "in the 65-70 range" in recent times. Tr. 788.   Although Dr. Bellville noted that plaintiff appeared to have "a number of medical problems," and felt that the "major reason" she was not currently working was because she over-focused on her physical symptoms and had "a longstanding history of some depression and anxiety," he concluded that it was "not supported by the available records that any of her medical or psychiatric conditions" were "preventing her from working." Tr. 785.

Plaintiff next argues that there is no evidence in the record that Dr. Cosgrove, who, as noted above, is a doctor of osteopathy, "was Board Certified in psychiatry." Plaintiff's Reply Brief, p. 4.  While this may be true, although the record is not clear either way on this issue, plaintiff has not shown exactly what being "board certified" implies in this context in terms of the credibility of Dr. Cosgrove and her findings and opinion.  Indeed, the assumption that psychiatric or psychological evidence must be offered only by those who have been board certified "is clearly erroneous," as "[t]here is no such requirement in the [Social Security] regulations." Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987).  As such, the Court finds this argument to be completely without merit.

Plaintiff also attempts to discredit the findings and opinions of both Dr. Cosgrove and Dr. Bellville by asserting that they did not conduct any psychological testing.  However, neither of these medical sources are psychologists.  Accordingly, while they certainly may choose to conduct such testing when evaluating a

1   claimant, they do not necessarily have to do so. Indeed, at least in the case of Dr. Bellville, plaintiff has not

2   presented anything to show that a psychiatrist must perform psychological testing in order to be qualified to

3   opine on the nature of a claimant's mental impairments and functional capabilities.

4        For the same reason, plaintiff's argument that Dr. Bellville's opinion regarding plaintiff's mental

5   work-related functioning must be discounted because he had no psychological evaluations to rely on when

6   opining that it is "not supported by the available records that any of her medical or psychiatric conditions"

7   were "preventing her from working," is equally flawed. Tr. 785. Thus, whether or not the record indicates

8   Dr. Bellville himself is "board certified," plaintiff has not shown that he is not a licensed psychiatrist, and

9   thus that he is not qualified to make findings with respect to and give an opinion on her mental functional

10  capabilities based on the medical evidence in the record available to him, not to mention based on his own

11  psychiatric evaluation. As such, the Court rejects this argument as well.

12       Plaintiff also makes much of the fact that Dr. Bellville does not specifically discuss the reports of

13  two non-examining consultative psychologists, Bruce Eather, Ph.D., and Charles Regets, Ph.D., or the

14  opinion evidence from Dr. Robert M. Bennett, her rheumatologist, while he discussed others. She argues

15  such lack of express discussion of the medical records from Drs. Eather, Regets and Bennett, makes clear

16  that he did not review this evidence. First, however, Dr. Bellville does specifically mention and discuss in

17  his evaluation report at least some of the medical opinion evidence and clinical notes from Dr. Bennett. See

18  Tr. 780-82. Second, the mere fact that Dr. Bellville did not mention specifically the non-examining report

19  of Dr. Eather and Dr. Regets does not mean he did not consider it. Even if he did not consider it, however,

20  it was not necessarily remiss of him to focus only on the objective, clinical evidence in the record. Finally,

21  plaintiff notes that Dr. Bellville also did not mention the report of Dr. Cosgrove. As discuss above though,

22  Dr. Bellville's findings and opinion are consistent with those of Dr. Cosgrove.

23       B.    Dr. Bennett

24       Plaintiff further takes issue with the ALJ's analysis of Dr. Bennett's opinion regarding her ability to

25  be consistently employed. Dr. Bennett began treating plaintiff as early as early May 1990. Tr. 273. At that

26  time, Dr. Bennett found that she had "the classical findings of fibromyalgia," as well as "some significant

27  psychological problems." Tr. 274-75. His clinical notes, however, show that she continued to work full

28  time and get good relief from myofascial trigger point injections through at least late June 2001. Tr. 211,

REPORT AND RECOMMENDATION
Page - 10

213, 222, 231-32, 236, 239, 246-47, 249, 251-52, 257, 259, 263-64.  Indeed, in both mid-November 2000, and late June 2001, Dr. Bennett stated he had been "quite impressed" that plaintiff had "managed to remain fully employed despite her pain and fatigue problems." Tr. 211, 222.  In mid-November 2000, he also had noted she was "displaying much better self-efficacy and less catastrophization." Tr. 222.

In a letter dated August 16, 2001, Dr. Bennett stated that plaintiff had chronic fatigue syndrome, fybromyalgia, osteoporosis, migraine headaches and depression, this latter condition, he noted however, "currently well controlled." Tr. 207.  In a letter dated September 4, 2001, Dr. Bennett stated that plaintiff's fibromyalgia, chronic fatigue syndrome, osteoporosis, and growth hormone deficiency were all "currently incurable," while her depression was "partially controlled." Tr. 205.  He further stated that plaintiff had "now got to a stage in her medical problems" that made it "impossible for her to be consistently employed in an efficient and productive manner." Id.  Thus, Dr. Bennett recommended that "she be permanently disabled and no longer able to work" as of September 5, 2001. Id.

The record also contains a "Proof of Disability Statement," dated January 7, 2003, and signed by Dr. Bennett. Tr. 615.  In that statement, Dr. Bennett states that he considered plaintiff to be disabled and to be unable to be regularly employed due to fibromyalgia, depression, and major family stressors. Id.  While Dr. Bennett states that plaintiff has had the last of these disabling conditions for the past one and a quarter years, he further states that her "disability" occurred on September 5, 2001. Id.

With respect the statements Dr. Bennett provided in early September 2001, and early January 2003, regarding plaintiff's disability, the ALJ found as follows:

> Dr. Bennett's assessment involves vocational issues of which he has no expertise.  He failed to respond to a subpoena to appear at the hearing.  Therefore, the undersigned has been unable to seek clarification of his opinion.  However, Dr. Bennett did provide additional treatment records which have been considered.  As noted above, although Dr. Bennett refers to a diagnosis of chronic fatigue syndrome, his treatment records reveal this diagnosis was not reached despite a work-up completed specifically to evaluate her fatigue. [Medical expert] Dr. [Frank E.] McBarron testified that she does not meet the diagnostic criteria for chronic fatigue syndrome.  He also testified claimant's growth hormone deficiency does not result in any work-related functional limitations.  While the claimant does have fibromyalgia and osteoporosis, there is no evidence that these are completely debilitating conditions.  She worked for many years despite these conditions and Dr. Bennett's treatment notes do not reflect a worsening of her condition in September 2001.  In fact, in a letter date August 16, 2001, he reported he had not seen the claimant since December 2000 (Exhibit 6F-187).  His October 2001 notes reflect good results from injections on September 14, 2001 (Exhibit 39F-554).  The opinions of Dr. Bennett are not consistent with the treatment record and are given little weight.

Tr. 625.  While plaintiff appears to take issue with the ALJ's analysis of Dr. Bennett's opinions regarding

1  her disability, her bases for challenging that analysis are not particularly clear.

2  Plaintiff first seems to imply that the ALJ did not do enough to seek clarification from Dr. Bennett,

3  stating that "[a]ll that was required was a simple letter requesting clarification." Plaintiff's Opening Brief, p.

4  17. However, it is not at all clear that sending an additional letter to Dr. Bennett requesting clarification,

5  after he already had failed to comply with the subpoena request, would have produced the desired result.

6  Indeed, as noted by the ALJ, while he did not appear in response to the subpoena, Dr. Bennett did submit

7  additional treatment notes, indicating at least that he was aware of the need for further clarification or other

8  documentation regarding his findings and opinions. Thus, while the ALJ does have a duty "to fully and

9  fairly develop the record and to assure that the claimant's interests are considered," the Court finds he met

10  that duty here, and that he was not required to make the additional request for information plaintiff argues

11  he should have made here. Tonapetyan, 242 F.3d at 1150 (citations omitted).

12  Plaintiff argues Dr. Bennett's opinions are consistent with those of Drs. Meharg, McBarron, Eather

13  and Regets, but does not explain in what ways they are consistent. Indeed, a review of the reports and

14  opinions of these medical sources reveals no such consistency. For example, while Dr. Bennett opined that

15  plaintiff was disabled and unable to work, he did so primarily on the basis of her physical impairments and

16  depression. See Tr. 205, 615. On the other hand, although Dr. Meharg found plaintiff had moderate and

17  marked impairments in her ability to interact appropriately to co-workers, supervisors, and the public, and

18  to respond appropriately to work pressures and changes in a work setting based on her on her depression

19  (Tr. 752), he did not specifically find her disabled. Further, although Dr. Bennett, as noted above, based his

20  finding of disability in part on plaintiff's depression, there is nothing in his treatment records to indicate how

21  he came to this conclusion.

22  With respect to Dr. Eather and Dr. Regets, as psychologists not surprisingly they made no findings

23  regarding plaintiff's physical symptoms or impairments. Indeed, even their mental functional capabilities

24  assessment is not particularly consistent with those of either Dr. Bennett or Dr. Meharg. That is, although

25  Dr. Bennett found plaintiff to be disabled in part due to her depression, and Dr. Meharg opined she had

26  moderate to marked limitations as a result thereof, Drs. Eather and Regets found that she had only mild to

27  moderate mental functional limitations based on a somatoform disorder. Tr. 435-36.

28  Unlike Dr. Bennett, furthermore, Dr. McBarron testified that he could not see where the diagnosis

of growth hormone deficiency had any meaning. Tr. 977.  In addition, in regard to the issue of plaintiff's chronic fatigue syndrome, "nowhere in the record" could Dr. McBarron find the criteria for that condition had been looked at, let alone met. Tr. 978.  Dr. McBarron also testified that a number of her conditions, including her fibromyalgia and sleep disorder, could account for plaintiff's symptoms of fatigue, although he felt her sleep disorder and de-conditioning to be the causes "more than anything else." Tr. 979-80.  Yet, at no point during the administrative hearing did Dr. McBarron testify or indicate any of plaintiff's alleged impairments, physical or mental, were at all disabling.

Finally, the Court notes that the specific reasons the ALJ provided for discounting the opinions of Dr. Bennett regarding plaintiff's disability were specific and legitimate.  First, the ALJ appropriately may decline to accept even a treating physician's opinion regarding a claimant's condition, vocational outlook, or even "the ultimate issue of disability," if supported by the record. Magellanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).  Here, the record contains such support.  As noted by the ALJ, there is no indication in either Dr. Bennett's treatment notes or elsewhere in the record that plaintiff's chronic fatigue syndrome, growth hormone deficiency, fibromyalgia or osteoporosis are of disabling severity.  Indeed, in addition to Dr. McBarron, at least one other medical source found her chronic fatigue syndrome, fibromyalgia and oseoporosis did not disqualify her from all work. Tr. 428-33.

Both Dr. Bennett and the ALJ also noted that plaintiff had managed to work for many years despite the presence of the above conditions.  In addition, the ALJ pointed out that it had been over eight months since Dr. Bennett last saw plaintiff when he issued his first statement of disability. See Tr. 207.  Lastly, at least with respect to her fibromyalgia, again, as noted by the ALJ, plaintiff showed good responses to her trigger point injections, which she had continued to receive for a number of years and well into late 2001.  Thus, for all of these reasons, the ALJ properly gave little weight to Dr. Bennett's opinions.

II.   The ALJ's Assessment of Plaintiff's Residual Functional Capacity

If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A claimant's residual functional capacity assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. Id.  It thus

1   is what the claimant "can still do despite his or her limitations." Id.

2        A claimant's residual functional capacity is the maximum amount of work the claimant is able to

3   perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work

4   must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those

5   limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a

6   claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-

7   related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the

8   medical or other evidence." Id. at *7.

9        Here, the ALJ assessed plaintiff with the following residual functional capacity:

10      [The] claimant has the residual functional capacity to lift 10 pounds occasionally and less
        than 10 pounds frequently.  She can stand and walk 2 hours out of an 8-hour day and sit
11      6 hours out of an 8-hour day.  She can occasionally climb, balance, stoop, kneel, crouch
        and crawl.  She is capable of simple, and some complex repetitive activities.  She is
12      limited to occasional contact with the general public.

13  Tr. 622.

14        A.    Dr. Eather and Dr. Regets

15        Dr. Eather and Dr. Regets completed a psychiatric review technique form in early March 2002.

16  Based on their review of the record, they diagnosed plaintiff with a somatoform disorder, which they found

17  resulted in moderate restrictions in her activities of daily living, moderate difficulties in maintaining social

18  functioning and in maintaining concentration, persistence or pace, and no episodes of decompensation. Tr.

19  445, 449.  In a mental residual functional capacity assessment form completed at the same time, Dr. Eather

20  and Dr. Regets found her moderately limited in her ability to: understand, remember and carry out detailed

21  instructions; maintain attention and concentration for extended periods; complete a normal workday and

22  workweek; perform at a consistent pace; interact appropriately with the general public; accept instructions

23  and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work

24  setting. Tr. 435-36.  Drs. Eather and Regests further opined that she was "capable of simple and some

25  complex repetitive activity on a persistent basis," and "would likely work more successfully away from the

26  general public." Tr. 437.

27        Plaintiff argues the ALJ erred in evaluating the mental residual functional capacity assessment form

28  completed by Dr. Eather and Dr. Regets, by failing to specifically discuss the moderate mental functional

REPORT AND RECOMMENDATION
Page - 14

limitations contained therein, and why he did not accept all of them.  The undersigned agrees.  In his

decision, the ALJ stated that he gave the state agency consultant opinions "significant weight," which found

plaintiff to be "capable of simple, and some complex repetitive activities," and "would likely work more

successfully away from the general public." Tr. 626.  However, as noted above, plaintiff also was found to

be moderately limited in her ability to: maintain attention and concentration for extended periods; complete

a normal workday and workweek; perform at a consistent pace; accept instructions and respond

appropriately to criticism from supervisors; and respond appropriately to changes in the work setting.

Nowhere in his discussion of plaintiff's residual functional capacity though, did the ALJ state why he did not

adopt these additional limitations.  This was error.

On the other hand, it is not clear that the ALJ was required to include these additional more specific

limitations in his assessment of plaintiff's residual functional capacity, or that he even considered them.  For

example, as discussed above, the ALJ did not err in rejecting the opinion of Dr. Meharg, who found her to

be moderately limited in her ability to interact appropriately with co-workers and supervisors.  In addition,

Dr. Bellville found no similar mental functional limitations, and Dr. Cosgrove expressly found she would

have "no impairment in her ability to maintain regular attendance, work on a consistent basis, and accept

instructions from supervisors, or interact with coworkers." Tr. 410.  Dr. Cosgrove, furthermore, found no

problems with plaintiff's concentration during her evaluation. Tr. 409.

B.   Plaintiff's Somataform Disorder

Plaintiff argues the ALJ erred in failing to include in his assessment of her residual functional

capacity, any limitations resulting from her somatoform disorder, even though that disorder was found by

the ALJ to be severe.  She asserts the ALJ failed to include any such limitations because he did not

understand that a somatoform disorder involves both physical and mental limitations.  Plaintiff points to

several cases that deal with somatoform, or somatization, disorders as asserted bases for claiming disability

to support her argument.  The Court, however, finds that none of those cases help her.

At least two courts have noted or adopted the following definition of these types of disorders:

[T]he essential features of this group of disorders are physical symptoms suggesting
physical disorder, transience, somatoform, for which [sic] are no demonstrable organic
findings or known physiological mechanism and for which there is positive evidence or a
strong presumption that the symptoms are [linked] to psychological factors or conflicts.

Carr v. Sullivan, 772 F.Supp. 522, 530 (E.D. Wash. 1991) (citation omitted); see also Parks v. Sullivan, 766

REPORT AND RECOMMENDATION
Page - 15

F.Supp. 627, 635 (N.D. Ill. 1991).  Courts also "have recognized the disabling nature of somatoform disorders, especially when they combine with physical impairments." Carr, 772 F.Supp. at 530 (citing Teter v. Heckler, 775 F.2d 1104, 1106 (10th Cir. 1985); Carrillo v. Bowen, 636 F.Supp. 97, 101 (D. Ariz. 1986)). Thus, "[c]omplaints of pain cannot be dismissed as incredible merely because they stem in part from a psychological abnormality, so long as the abnormality is shown by 'medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques.'" Teter, 775 F.2d at 1106 (quoting 42 U.S.C. § 423(d)(5)(A)(1985 Supp.); Carr, 772 F.Supp. at 530.

While it may be that an ALJ may not merely consider the psychiatric and psychological evidence relating to a claimant's somatoform disorder only so far as it concerns the claimant's "ability to perform mentally and emotionally," because such an approach "reflects a lack of understanding and appreciation of the diagnoses of that mental disorder," such is not the case here. Parks, 766 F.Supp. at 637.  There is no indication that the ALJ misunderstood the nature of the diagnosis.  Indeed, as noted by plaintiff herself, the ALJ found her somatoform disorder to be "severe."

Plaintiff implies this finding alone – i.e., a finding of severity – requires that limitations from the particular impairment must be included in the ALJ's residual functional capacity assessment.  The step two severity inquiry, however, is merely a *de minimis* screening device used to dispose of groundless claims. Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996).  In other words, just because a claimant is found to have a severe impairment or combination of impairments, does not itself mean the substantial evidence in the record supports inclusion of any limitations that may stem therefrom in the residual functional capacity assessment.  Other than the moderate mental functional limitations discussed above that the ALJ failed to address, plaintiff has pointed to no other limitations stemming from her somatoform disorder that the ALJ failed to consider or was required to include in her residual functional capacity assessment.

In each of the cases cited by plaintiff, furthermore, not only was there a failure to understand by the Commissioner the nature of a somatoform disorder, but the weight of the medical evidence supported a finding of disability on the basis of that impairment.  In one case, for example, the court expressly found the ALJ had ignored the "overwhelming psychiatric and psychological findings" that the claimant was "experiencing real pain that would render her unable to perform physically in a work environment." Parks, 766 F.Supp. at 637.  In another case, the court determined that the Appeals Council improperly discounted

1   substantial evidence in the record, which indicated the claimant was experiencing "anxieties regarding his

2   physical condition which" were "somatically manifested and preclusive of his ability to function in a work

3   environment." Carrillo, 636 F.Supp. at 100.

4         As before, plaintiff argues the ALJ erred in evaluating the opinion of Dr. Meharg.  The Court has

5   explained already why the ALJ did not err in this regard, and will not do so again.  Plaintiff further argues

6   the ALJ's reliance on the evaluations and opinions of Drs. Bellville and Cosgrove was improper, pointing to

7   the fact that neither medical source conducted any psychological testing.  Once more, for the reasons set

8   forth above, the Court rejects this basis for discounting their opinions.  Plaintiff also now raises the issue

9   that Dr. Cosgrove had no medical evidence to review at the time of her report.  However, plaintiff makes no

10  persuasive argument that a review by Dr. Cosgrove of other medical evidence in the record was needed,

11  particularly in light of the fact that she did her own psychiatric examination and, as a doctor of osteopathy,

12  also had a legitimate background for assessing plaintiff's physical condition as well.

13        Next, plaintiff asserts Dr. Cosgrove conceded that as a result of her somatoform disorder and

14  depression, she was limited to occasional contact with the general public and only capable of simple and

15  some complex tasks.  While Dr. Cosgrove did diagnose plaintiff with a somatoform disorder, she made no

16  such findings regarding the above limitations.  Rather, it was the opinion of Dr. Eather and Dr. Regets that

17  plaintiff had these limitations based on her somatoform disorder.  Even so, as discussed above, the ALJ in

18  fact included these limitations in his assessment of plaintiff's residual functional capacity, and the Court, also

19  as discussed above, already has found the ALJ erred in failing to address the other specific moderate mental

20  functional limitations found by Drs. Eather and Regets.

21        Plaintiff argues the ALJ ignored or overlooked the fact that Dr. Bellville listed her "[c]ontributing

22  physical problems" of fibromyalgia, osteoporosis, and sleep apnea, among other alleged impairments as

23  found in the record.  See Tr. 787.  There is no evidence in the record or the ALJ's decision that the ALJ

24  ignored or overlooked this notation of Dr. Bellville's.  Even if the ALJ did not specifically consider it,

25  however, plaintiff has not shown what bearing this would have on the issue of which limitations she feels

26  should have been included in her residual functional capacity assessment.  Indeed, as noted by the ALJ and

27  discussed above, Dr. Bellville expressly opined that the evidence did not support a finding that any of her

28  medical or psychiatric conditions were preventing her from working. Tr. 785.

1    Plaintiff points to the other statement in his report that the main reason she was not working was

2    because she over-focused on her physical symptoms and had a long-standing history of some depression and

3    anxiety, as being consistent with a somatoform disorder. Tr. 785.  Plaintiff further asserts that this is

4    consistent with the testimony of Dr. Robert John McDevitt, who noted there were indications in the record

5    of diagnoses of somataform disorder. <u>See</u> 984-85.  As such, plaintiff argues Dr. Bellville "simply missed"

6    this diagnosis. Plaintiff's Opening Brief, p. 22.  Again, though, the mere existence of an impairment does

7    not establish disability, and Dr. Bellville did opine that plaintiff was capable of working. <u>See</u> <u>Matthews v.</u>

8    <u>Shalala</u>, 10 F.3d 678, 680 (9th Cir. 1993).  To the extent that opinion may be inconsistent with his remarks

9    concerning the "main reason" plaintiff was not working, furthermore, that conflict is solely for the ALJ to

10   decide. <u>See</u> <u>Reddick</u>, 157 F.3d at 722; <u>Sample</u>, 694 F.2d at 642.

11   In addition, while Dr. Bellville himself may not have come outright and stated plaintiff suffered from

12   a somatoform disorder, he did note there was at least a question of that diagnosis in the record and that she

13   tended to "over-focus on somatic complaints." Tr. 787.  Therefore, plaintiff's attempts to convince this

14   Court otherwise notwithstanding, she has not shown Dr. Bellville "simply missed" her true diagnosis or that

15   he was unaware of the nature of somatization type disorders.  Indeed, as indicated above, he appears to be

16   well aware of their nature, as one would expect of a licensed psychiatrist, i.e., one who is trained to deal

17   with both the mental and physical aspects of medical care.  In any event, also as discussed above, Dr.

18   Bellville's findings and opinion are largely consistent with those of Dr. Cosgrove, who herself did diagnose

19   plaintiff outright with a somatoform disorder.

20   III.    The ALJ Properly Assessed Plaintiff's Credibility

21   Questions of credibility are solely within the control of the ALJ. <u>Sample v. Schweiker</u>, 694 F.2d

22   639, 642 (9th Cir. 1982).  The Court should not "second-guess" this credibility determination.  <u>Allen</u>, 749

23   F.2d at 580.  In addition, the Court may not reverse a credibility determination where that determination is

24   based on contradictory or ambiguous evidence.  <u>Id.</u> at 579.  That some of the reasons for discrediting a

25   claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long

26   as that determination is supported by substantial evidence. <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1148 (9th

27   Cir. 2001).

28   To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the

1  disbelief." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted).  The ALJ "must identify

2  what testimony is not credible and what evidence undermines the claimant's complaints." Id.; Dodrill v.

3  Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering,

4  the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at

5  834.  The evidence as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811,

6  818 (8th Cir. 2003).

7         In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

8  evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other

9  testimony that "appears less than candid." Smolen, 80 F.3d 1273 at 1284.  The ALJ also may consider a

10 claimant's work record and observations of physicians and other third parties regarding the nature, onset,

11 duration, and frequency of symptoms. Id.

12        The ALJ found plaintiff's "statements concerning the intensity, duration and limiting effects" of her

13 symptoms to be "not entirely credible." Tr. 623.  For example, the ALJ found her allegations of debilitating

14 fatigue to be "not entirely credible in light of her lack of compliance with treatment recommendations for

15 sleep apnea." Id.; Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) (claimant's failure to assert good reason

16 for not following prescribed course of treatment can cast doubt on sincerity pain testimony).  In addition,

17 the ALJ noted that while plaintiff alleged debilitating pain, trigger point injections consistently resulted in

18 good relief and her migraines were well-controlled by medication. Tr. 623-24; Morgan v. Commissioner of

19 Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999) (ALJ may discount claimant's credibility on basis of

20 medical improvement); see also Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998).

21        The ALJ further noted other areas where plaintiff's complaints were inconsistent with the medical

22 evidence in the record. Tr. 623-24; Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir.

23 1998) (ALJ determination that claimant's complaints are inconsistent with clinical observations can satisfy

24 clear and convincing requirement).  While plaintiff makes a general assertion that the ALJ erred in

25 discounting her credibility, she points out no specific instances of impropriety.  However, such a broad,

26 unsubstantiated allegation is wholly insufficient to prevail on this issue.  Plaintiff does state that the lay

27 witness statements in the record supported plaintiff's testimony.  However, even if this were a proper basis

28 on which to challenge the ALJ's credibility assessment, a finding the undersigned does not make, the ALJ,

1  as discussed below, also properly evaluated the lay witness statements contained in the record.

2  IV.      The ALJ Did Not Err in Evaluating the Lay Witness Statements in the Record

3         Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into

4  account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to

5  each witness for doing so." Lewis v. Apfel, 236 F.3d, 503, 511 (9th Cir. 2001).  An ALJ may discount lay

6  testimony if it conflicts with the medical evidence. Id.; Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir.

7  1984) (proper for ALJ to discount lay testimony that conflicts with available medical evidence).  In rejecting

8  lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for

9  dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those

10 reasons," and substantial evidence supports the ALJ's decision. Lewis, 236 F.3d at 512.  The ALJ also may

11 "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

12        Plaintiff submitted the statements of three lay witnesses with her application.  The ALJ discounted

13 all three such statements for the following reasons:

14        Bill White, the claimant's spouse, reported in October 2001 that she could move about
          for about one hour.  She sometimes used a scooter.  Carrying objects made her hands
15        cramp up.  When tired she turned words around.  Writing for a long time made her
          shoulder muscles ache.  She was in a better frame of mind since quitting her job (Exhibit
16        4E).  The observations of Mr. White are not entirely credible in light of the treatment
          record.  While the claimant may use a motorized scooter, this has not been medically
17        prescribed.  There is no evidence of a hand impairment.  The claimant reports playing
          the keyboard (Exhibit 36F-498).  Psychological evaluations have revealed no evidence
18        of communication difficulties.

19        Laura Keesee, a friend of the claimant reported in April 2002 that she moved slowly and
          stiffly.  She used a mobile shopping cart at the store and a wheelchair at parks and
20        stores.  She had difficulty with climbing stairs.  She did not lift heavy things.  She rested
          often.  Her hands cramped up after writing for awhile.  She had migraine headaches
21        which took her off her feet for days.  She was on a lot of medications (Exhibit 7E).  The
          observations of Ms. Keesee are not entirely credible.  While the claimant may use a
22        motorized scooter, this has not been medically prescribed.  There is no evidence of a
          hand impairment and no evidence that her migraine headaches are not controlled with
23        medication.

24        Kandi Haynes, a friend of the claimant, reported in April 2002 that [the] claimant was
          extremely limited due to weakness.  She could walk ¼ to ½ block (Exhibit 8E).  The
25        report of Ms. Haynes is not consistent with the claimant's own statements that she is
          able to stand and walk up to one hour before resting (Exhibits 3E, 9E).
26
27 Tr. 624-25.  Plaintiff argues these are not germane reasons for rejecting the lay witness statements in the

   record.  The undersigned disagrees.
28
          As noted above, the ALJ may discount lay testimony if it conflicts with the medical evidence in the

record. Lewis, 236 F.3d at 511; Vincent, 739 F.2d st 1395.  For example, here the ALJ correctly noted that while Mr. White and Ms. Keesee stated plaintiff used a motorized scooter to get around at times and that her hands cramped up, no such scooter was ever medically prescribed and there was no objective medical evidence of a hand impairment.  Plaintiff argues the ALJ ignored the testimony of Dr. McBarron and his own determination that she had a "severe" somatoform disorder.  Dr. McBarron, however, never provided any testimony regarding any hand impairment or the need for a motorized scooter, and, as discussed above, the mere fact that the ALJ found plaintiff's somatoform disorder to be severe does not in itself necessarily support the additional mental or physical limitations testified to by these lay witnesses.

Plaintiff next argues Ms. Hanes' lay witness statement regarding the limitations on her ability to walk in April 2002, reflected the ability to walk at that particular time and was consistent with plaintiff's testimony that some days were worse than others.  As discussed above, however, the ALJ did not err in discounting plaintiff's credibility regarding her symptoms and impairments.  In addition, the testimony of Ms. Hanes concerning plaintiff's ability to walk is not necessarily consistent with claims that some days are worse than others, and, even if it could be so argued, the ALJ's interpretation is equally valid. See Reddick, 157 F.3d at 722 (ALJ is responsible for determining credibility and resolving ambiguities and conflicts in evidence); Allen, 749 F.2d at 579 (court may not reverse credibility determination where that determination is based on contradictory or ambiguous evidence).  Finally, as noted by the ALJ, Ms. Hanes' testimony contradicted plaintiff's own testimony on the specific subject of her walking ability.

V.     The ALJ Erred in Finding Plaintiff Capable of Returning to Her Past Relevant Work

Plaintiff has the burden at step four of the disability evaluation process to show that she is unable to return to her past relevant work. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).  Here, the ALJ found plaintiff's residual functional capacity, as set forth above, did not preclude her from returning to her past relevant work as an accounts payable clerk. Tr. 626.  Plaintiff argues the limitation to "simple, and some complex repetitive activities" contained in that assessment precludes her from being able to perform this particular job. Tr. 622.  The undersigned agrees.

Plaintiff asserts the job of accounts payable clerk as identified by the vocational expert and defined by the Dictionary of Occupational Titles ("DOT") requires a specific vocational preparation ("SVP") level

of 5,[4] which constitutes it "skilled" work. DOT 216.482-010 (accounting clerk).[5]  The ALJ also found that

this job required a SVP level of 5, and was skilled work. Tr. 626.  Plaintiff further points out that the job of

accounting clerk requires a reasoning level of 4, which is defined as follows:

> Apply principles of rational systems to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists.  Interpret a variety of instructions furnished in written, oral, diagrammatic, or schedule form.  Examples of rational systems are: bookkeeping, internal combustion engines, electric wiring systems, house building, farm management, and navigation.

DOT 216.482-010; see also DOT, Appendix C.

Plaintiff argues skilled work requires more than the ability to perform "simple, and some complex

repetitive activities," which, she asserts, is much more analogous to level 1 rather than level 4 reasoning.

The DOT defines Level 1 through 3 reasoning as follows:

> LEVEL 3
>
> Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.
>
> LEVEL 2
>
> Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.
>
> LEVEL 1
>
> Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

DOT, Appendix C. The definition of Level 1 reasoning expressly references "simple one- or two-step

instructions," whereas the definitions of Level 2 and 3 reasoning deal with somewhat more "detailed" or

complex instructions. Id.  Level 4 reasoning, on the other hand, clearly requires the ability to function in

situations that involve much more complexity. Id.  Thus, while the DOT does not explicitly state which of

the above levels of reasoning corresponds to simple, and some complex repetitive tasks, a commonsense

---

[4]The term "SVP" is defined as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." DOT, Appendix C. An SVP level of 5 is "[o]ver 6 months up to and including 1 year." Id.; DOT 216.482-010.

[5]While the vocational expert did not attach a DOT job number to the accounts payable job he identified, defendant has not objected to the DOT job description referred to by plaintiff.  Accordingly, the undersigned adopts that description as well.

1  reading of the DOT's definitions indicates that it is less than Level 4.

2  VI.     This Matter Should Be Remanded For Further Administrative Proceedings

3          The Court may remand this case "either for additional evidence and findings or to award benefits."

4  Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course,

5  except in rare circumstances, is to remand to the agency for additional investigation or explanation."

6  Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in

7  which it is clear from the record that the claimant is unable to perform gainful employment in the national

8  economy," that "remand for an immediate award of benefits is appropriate." Id.

9          Benefits may be awarded where "the record has been fully developed" and "further administrative

10 proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d

11 1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

12           (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's]
             evidence, (2) there are no outstanding issues that must be resolved before a
13           determination of disability can be made, and (3) it is clear from the record that the ALJ
             would be required to find the claimant disabled were such evidence credited.
14
15 Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Plaintiff

16 argues this matter should be remanded to the Commissioner for an outright award of benefits in light of the

17 marked limitations found by Dr. Meharg, which she asserts the Court should credit as true.  As discussed

18 above though, the ALJ properly discounted those findings.  Thus, while it may be that the vocational expert

19 testified that plaintiff would not be able to sustain employment at a competitive level "over the long haul"

20 based on those limitations, that testimony is of no import. Tr. 994-95.

21         Accordingly, because issues remain with respect to plaintiff's residual functional capacity, and

22 because a determination regarding her ability to perform other work existing in significant numbers in the

23 national economy at step five of the disability evaluation process is still needed, this matter should be

24 remanded to the Commissioner for further administrative proceedings.

                                           CONCLUSION

25         Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff

26 was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for

27 further administrative proceedings in accordance with the findings contained herein.

28         Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b),

REPORT AND RECOMMENDATION
Page - 23

the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **January 5, 2007**, as noted in the caption.

DATED this 14th day of December, 2006.

Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION
Page - 24